Having no evidence against Dale Helmy, Fowler, his deputy, a trooper, and two prosecutors who were not sued, withheld material Brady evidence, fabricated evidence, and outside the immunity offered by trial testimony, agreed to present false, fabricated, and perjured testimony. As a result, an innocent man spent nearly 15 years in the penitentiary until the habeas courts in Missouri freed him, finding four judges, a trial judge and three appellate judges, Witt, Pfeiffer, and Martin, finding that the Brady evidence was material, that it was not cumulative, it was corroborative, and under Missouri law, it was admissible. Contrary to that, the district court found it was not admissible, that it was cumulative and not corroborative, misapplying the applicable law in this case. A second aspect of this is the conspiracy that was involved that derailed justice from the very beginning. I find it interesting that in the preceding case that was argued, the conspiracy there needed to be proved beyond a reasonable doubt. The conspiracy in our case needs only be proved by a preponderance, and at the summary judgment stage, we are entitled to all the reasonable inferences. The reasonable inferences are substantial. There was no physical evidence, no trace evidence, no eyewitness evidence against Dale Helmy. There was literally, not figuratively, no evidence against Dale Helmy, and a substantial amount of evidence pointed to his father for having killed Dale's mother in the middle of Ted and Norma's divorce. And in order to secure the conviction of Dale Helmy, the unsued prosecutors outside the tent of immunity that a trial presents, and they're not sued, of course, because they have absolute prosecutorial immunity because they were engaging in a prosecutorial function, conspired with the sheriff, a deputy and a trooper, and created a piece of fiction that was presented inside the immunity tent throughout the trial. Most palpably, Trooper Westfall, who died after his deposition in this case, and the case was settled with his estate, so he's no longer a defendant, but he was a conspirator, and all conspirators are liable for the acts of their co-conspirators. It happened to be in the Norma Helmy murder only because he was present when Dale was arrested some nine months after the murder. And Sheriff Fowler asked him if he would take a statement from Dale, which he did. In that statement, the trooper, as he may lawfully do, lied and said that his mother had recently died, and Dale, in the course of that, said he was sorry, I'm sorry. And then the trooper asked him if he participated in the murder of his mother Norma, and Dale said, I did not. And the trooper wrote those two facts down in his report. And two years later at trial, having had no other participation in the Norma Helmy murder case, Westfall is called as the 30th and last witness in the state's case, and at the end of his direct examination by the prosecutors, after the penultimate question, the prosecutor asked the court if he could take a break. He walked over to counsel table and said, may I confer? And he conferred. Holt, you better stick with the, since we're not in a jury situation, you better stick with the microphone. I wasn't going to say anything because that's the point, because he spoke out of the presence of the jury, and the courtroom felt deadly silent. And he came back and he said, Trooper Westfall, I'm paraphrasing, I didn't memorize the transcript, as to that last conversation you were talking about with the defendant Dale Helmy, did he ever deny killing his mother? Answer, no, sir, he did not. It was in the trooper's report that he in fact had denied. That was one aspect of this. So was he impeached then with his report? No, no. He had ineffective counsel? Well, counsel in this case was troubled. He was handicapped by not having the Brady evidence, significant Brady evidence. Well, not on this point. Not on this point. Not on this point, no. Westfall could have been impeached. He could have been. He could have been impeached. But he put perjured testimony on. In his deposition in this case, Westfall said he read his report just minutes before he went into the courtroom. So similarly staged was this country kitchen incident in which two months before the death of Norma, Ted, her husband, had actually thrown hot coffee on her at the country kitchen in Jefferson City, and the police had been called, and they wrote a report, and they had that. This came out in the case. And so Fowler then testified. The testimony itself is immune, we acknowledge. But it was so scripted it had to have been concocted, the reasonable inference that we believe we're entitled to, outside the immunity tent. He asked him if he was aware of a similar incident, of which there was none. He said yes. And did this happen just a couple of days before Norma's murder? Yes. Was it similar with respect to coffee being thrown on Norma? Yes. And who was that? It was Dale. That never happened. There were no witnesses. The sheriff knew it. It had never been substantiated. It hadn't even been investigated. It was probably inadmissible, too, I suppose, if there's not a proper objection on foundation. And when a corroborating witness, Carol McKinney, was called from the country kitchen and started testifying that what she knew she'd learned from somebody else and wasn't sure when it was, a hearsay objection was sustained. When the sheriff testified, there should have been an objection for lack of foundation, I suppose. Well, it could have been. I'm not going to second-guess trial counsel, but certainly he should never have been placed in that situation where this manufactured evidence was produced. Well, I thought your point was that the sheriff just heard about this from somebody shortly before the trial, and it was all based on hearsay. It completely was. How is that a 1983 violation if he testified to hearsay and nobody objected to it? It should have been objected to. So what's going on here? I think the reasonable inference is we have an innocent man on trial for which there is no evidence. The prosecutor and the sheriff have no evidence, and they have an incompetent defense counsel. And I think they just decided they're just going to drive this train right through there. And it was the first murder that had occurred under this newly elected sheriff. It was his first case. We had both prosecutors who were running for political office at the time. One was running for Congress, and he had press availabilities during recesses or after trial in the courthouse. I mean, this was justice gone awry. And the sheriff also withheld the fact that five to 15 times in the months preceding her death, Norma had come to him out of fear of Ted, not Dale, and had asked about a gun and how to protect herself. And he had not disclosed those. And instead, this manufactured evidence that was composed outside the immunity of the trial attempted to give the motive, to shift the motive from the father to Dale. I thought that Fowler testified that Norma had contacted his office on a number of occasions. Yes, he said about the divorce. He had to specify the number. I mean, particularly when you combine that with the other evidence of the existence of a temporary restraining order and filing for divorce. I mean, all of that was in evidence, was it not? He had filed that the sheriff had actually served Ted, the father, with the divorce papers, and she had come to him about some concerns about property. Everything that he said at trial was that she had come to him about property issues. But what he failed to disclose was that five to 15 times Norma had come to him out of fear of Ted and coupling with getting a gun. So it's the nondisclosure of her fear of Ted when, in fact, the whole prosecution was aiming at. . . Wasn't there evidence that a temporary restraining order had been issued? There was for property. And the prosecution said the TRO, I think the word was this is typically done in a divorce case to preserve the distribution of property. In fact, there was a forthcoming hearing on the temporary restraining order the week after Norma was murdered, which adds to the motive for the father to kill her. Wasn't there also evidence, though, that she asked about a gun permit? Yes, she had asked about a gun permit, but what was withheld was that it was because of her fear of Ted, not the fear of Dale, as the sheriff admitted later in the 2115 PCR. And what makes this really important together with the country kitchen matter is because they fabricated the country kitchen incident involving Dale in order to show that he must have had some motive to kill his mother. He was angry enough two days before her murder to throw hot coffee at him. And so the withholding of this Brady material, and it was not cumulative, of any other evidence that she was afraid of Ted makes that important. Let me ask you one question on that Brady issue. As I read this, you cited the Missouri Court of Appeals opinion earlier. Yes. You said that they had concluded that this evidence would have been admissible, that this Brady evidence you're referring to from the sheriff would have been admissible. Now, on page 250, they say at the time, the undisclosed evidence would have been properly determined to be inadmissible. Aren't they saying that because of the new evidence about the purse that created a better inference that Ted may have been involved, that the undisclosed evidence would have been admissible in retrospect? Yes. But Judge McElwain, the trial judge, when he wrote, his point was that the evidence of the fear of Ted was not cumulative because there had been no other evidence of fear of Ted. So he said either with or without the subsequent purse evidence, it would have been admissible. The Court of Appeals then looked at this and said, well, maybe not. Maybe yes. You were referring to the district trial. McElwain's trial, which was affirmed. Well, I know, but on maybe a different rationale. I understand now. Yes. Yes. I like to save what little I have left. You may. That's fine.  Mr. Leitner, we'll hear from you. Thank you, Your Honor. Four of the seven claims have now been abandoned, so we are down to the three claims of alleged Brady violations, alleged fabrication of evidence, and alleged conspiracy. With regard to Brady, the issue is, was there even a Brady violation? Because it's not a violation if evidence is available to the defense from other sources or already possessed by the defendant. And evidence disclosed even during the trial, which is in play in this case because of Norma's notes that came up during the time of trial, is not a Brady violation. What about the abuse reports to the sheriff? The Country Kitchen incident. No, no, I'm talking about the argument that the sheriff knew that she, Norma, had complained five to 15 times about abuse by Ted. Well, first of all, I think that that's a misstatement of what the testimony was. Fowler has testified now five times over the course of years in the helming matter, and I urge the Court to consider his testimony that's in the record, because when you review it all, I don't believe there are inconsistencies. What he said at trial was that she had contacted himself or his office on a number of occasions. He wasn't asked any follow-up questions about, well, how many. Later, with the benefit of that trial transcript, the habeas counsel drilled down and said, well, how many occasions? And he said, well, I don't know. And he said, well, give us an estimate. He finally said five to 15, but that's off the top of my head and it's a guess. So now we've ‑‑ Well, what about the subject of the contacts? The subject of the contacts was, as he said in the trial, related to the divorce proceedings. And he wasn't asked any further questions about it. What begs the question is that why wasn't he? Because the defense had at its disposal Norma's notes which talked about seeing about registering a handgun. They had Norma's notes which talked about her being afraid of Ted and that she was afraid Ted could abuse her, that he had abused her in the past and might again. These are documents in defense counsel's possession at the time of trial. So it's a red herring to suggest that because defense counsel elected not to ask more specific questions of the sheriff, that the sheriff's testimony was in any way improper or inappropriate. He testified, he answered the questions that were asked of him on that point. Well, I thought the argument was that the state didn't disclose that she had complained to the sheriff about abuse and that if that had been disclosed, then it would have prompted the questions that you're saying were not asked. But I'm saying that, first of all, when you read the testimony of Sheriff Fowler at the later proceedings and in his deposition, I don't think that the testimony really supports that. He says that she – Supports that she – That it was about abuse. He said she came to him about a handgun. She lived out in the country. She was alone. He did not say that it was about Ted. He said, yes, I knew they were going through a divorce and were having troubles, but the main things that she was contacting me about were because he was getting rid of property. And I was telling her, Norma, talk to your divorce lawyer about that. But my other point is that the defense counsel had in its possession Norma's own notes that said, he has abused me in the past and I fear he will do it again, and in the same note says, check on handgun permit. I can give you the exact appendix for the notes. Yeah, go ahead. The appendix 277, and in addition, the existence of those notes was actually first brought up by defense counsel in questions to Deputy Backus at 292-293, indicating he was already aware of the notes because he said, did you pick up some notes off the coffee table? And that's when the issue came up and Backus said, yes, and I have them back at the office. He reappeared the next day with the notes. Interestingly, the defense counsel then objected to the introduction of the notes, even though the notes had evidence of handgun and abuse. Furthermore, on the issue of the handgun permit, Prosecutor Schoemeier testified in this case in his deposition that he was aware that Norma had sought a handgun permit from Sheriff Fowler. So even assuming for the sake of argument that there was a material Brady violation, the information was in the hands of the prosecutor. So it would be the prosecutor's duty at that point to turn it over. The same is true. What was in the possession of the prosecutor? The notes? Not the notes. The information that Norma had seen the sheriff about a handgun. He testified that, yes, I was aware of that before trial. What about the temporary restraining order that's been mentioned? The temporary restraining order was in evidence. Well, but was it, for lack of a better term, kind of a standard temporary restraining order that is served on a defendant in a divorce as a matter of course with the divorce complaint and the summons that is done every time an action is filed? Or was it something different that was requested by Norma because of some particular extraordinary concern about something? I understand the question. It actually contained both. There was a temporary restraining order preventing him from disposing of property, but it also restrained him from abusing her, threatening to abuse her. And I think the distinction is that now we would talk about an order of protection, but in this case it was a temporary restraining order. But there was testimony, including from the sheriff at trial, that, yes, you would expect, and I know that I served it, yes, you would expect there would be a provision in there referencing no threats, no physical violence. But my question is, is that something that's just done in every case? I don't know the answer to that. I know that, as Mr. Benson pointed out, there was at least at one point a hearing date set on the temporary restraining order, so that would indicate to me that it was more than just your standard, typical boilerplate order. But with or without the order, what the defense and the appellant had in their own possession was knowledge, as they've both admitted, that she had been abused or she claimed to have been abused in the past and that she, according to Dale Helmick's testimony at his deposition, had told him that she was afraid he was going to kill her. So they had all of this information. The bottom line was they had no intention of pursuing it. This defense counsel, for whatever reason, chose to stand on his theory of corpus delicti, that the state would not be able to prove a murder, despite Norma Helmick being found in the river in a gown tied to a cinder block. Now, what about the country kitchen testimony? Where does Fowler say that he gained the knowledge that Dale had thrown coffee at his mother? And just so I can put this in perspective. Well, just answer that first. Okay. He testified and, well, in fact, it's also supported by the record. He testified that that information was provided to him by Prosecutor Schollmeier immediately before. Should we be troubled that the prosecutor tells the witness that there had been such an incident and then asks the witness in the trial, are you aware of it? And the witness just says yes as though the witness knew about it from some other, you know, some legitimate source. Okay. Do I like it? No, I don't like it. But if I'm asked, first of all, the problem with the point is, is that the country kitchen incident clearly came to be by virtue of a witness coming forward to the prosecutor, this Carolyn McKinley, just before day two of the trial, right after Vortire, and said, hey, there's another waitress that says she saw Dale do the same thing. So at that point. So rather than try to find out who saw it. Well, no. They tell the sheriff and have him testify. No, no. They did. They then attempted to find the other witness. But the significance is, is that on the record, they endorsed, they asked and received late endorsement of both the waitress who said she overheard this and the waitress that they were going to try to find. So they endorsed these two in court in front of defense counsel. Defense counsel made no objections. And later, when the waitress tried and did testify as to what she overheard the other waitress say, that, yeah, I just saw her son throw coffee in her face, then Jordan finally objected on the basis of hearsay and asked that it be stricken. The point is, he knew. He knew the source of the information. He knew it was endorsed by the prosecutor immediately before the trial. He knew that it was based on hearsay. He made no objection when, and Fowler wasn't asked as much as exactly what was referenced in the direct. He was asked, were you aware of an altercation at the country kitchen involving Dale? Yes. He didn't say anything about coffee. When was it? But, I mean, it wasn't as specific as what the waitress ended up testifying to. And, again, the actual. It was improper, wasn't it? Lots of things in this trial were improper, Your Honor. But what's being requested of this court is to place the sins of others on the sheriff's back. And in this instance. So you're saying, well, the sheriff, all he did was answer questions, and the rules of evidence should have kept it out, but that's not a constitutional violation by the sheriff. Absolutely. And no matter how much material we had provided to this defense counsel, he wasn't going to use it, even if the rules of evidence allowed it. Because we know that, because he already had an evidence that, and this was straight from the sheriff, that the sheriff considered Ted a suspect. That, let me just. That she had contacted him on a number of occasions. That he served Ted with a TRO. That Norman was concerned about it. That it would have included a restraint against physical threats. These were all things the sheriff testified to at the trial. So who are the sins of, who are the others, the sins of others? You're talking about the defense, the defense counsel who doggedly pursued a single defense hearing and didn't cross-examine adequately. Are you talking about the prosecutors who did some sloppy work here? I am not certain how the prosecutors elected to handle some of the matters that they handled. I do want to make one point, though, on that point. When they talk about Westfall's answer to the question about no, the, there had never been a denial by Dale. That's not exactly how, he was asked a difficult compound question that said, did he ever, and particularly in this last conversation, deny? And so then Westfall answered no. But it was a bad question. Whether that was designed to be that way or not, I don't know. But primarily what I'm talking about is. He's entitled reasonable inferences on summary judgment. But, Your Honor, the reasonable inferences that they're asking you to draw are contrary to specific evidence in the record because Sheriff Fowler, for example, testified, and there's been no dispute to this fact, that he did not know he was going to be asked those questions about the country kitchen. There's no contrary evidence to rebut that. So it's not a reasonable evidence to say because a prosecutor meets with a witness in advance of trial, that means something improper happened. But primarily when I talk about the sins of others, I am talking about defense counsel. Part of the reason this was overturned was ineffective assistance of counsel by an impaired attorney hired by the other suspect, Ted, to represent the accused, who continued to pursue this theory of corpus delicti, who refused to use a mountain of evidence that was at his disposal that pointed towards Ted, elected not to attack any of the state's theories in any credible way, and chose not to present alibi evidence that was readily available. If there's evidence of a conspiracy, it would only be as between the defense counsel and Dale Helmick's father, who hired him. All right. Thank you, Mr. Leitner. Thank you. Mr. Benson, we'll hear from you in rebuttal. Yes. Lots of things in this trial were improper. That's what counsel conceded. There were lots of things. And as Judge Colleton pointed out, we are entitled to the reasonable inferences at this point in summary judgment. And it's important, especially with respect to our conspiracy claim, that it be viewed as one event, not piecemeal and slicing it up. But false testimony and meeting between prosecutors and witnesses alone isn't sufficient to make that inference under Westhoff, is that right? No. They acknowledge that they met before trial. That's common to prepare witnesses for trial. In this case, it's important because what happened at trial was so orchestrated, and I don't need to repeat that because we spelled that out in our briefs, but it was so orchestrated, resulting in fabricated evidence or perjured testimony, it only could have played effectively if it had been orchestrated in advance. That is an important, reasonable inference that we are entitled to. In the few seconds I have left, what the sheriff said in the 29-15, about the 5-15 visits, and her fear of Ted, I believe is in the appendix at 358 and 385. The TRO that was served was boilerplate. They testified this is typical boilerplate that was served in conjunction with the dissolution petition. The sheriff was told in advance about the coffee kitchen witness, Carol McKinney, being there. Whether or not he was told he was going to be questioned about it doesn't matter. He was questioned about it, and he gave false testimony based on what he said, what later said was unsubstantiated and had not been investigated. And while he had the power of the sheriff, he could have tried to find those missing witnesses, but he didn't. I'm sorry, but my time has expired. Thank you. Thank you for your argument. Thank you to both counsel. The case is submitted, and we will file an opinion in due course.